**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **INTERNATIONAL PROTECTIVE SERVICES, INC.,** | ) | |
| **Plaintiff,** | ) | **No. 03-2824C** |
| **V.** | ) | **(Judge Lettow)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

PLAINTIFF'S AMENDED COMPLAINT

1. By Order dated June 6, 2007, the date to file Plaintiff's Amended Complaint was extended to July 30, 2007. In accordance with that order, Plaintiff, International Protective Services, Inc., doing business as International Services Inc. ("ISI"), by its attorneys, Gdanski & Gdanski, LLP, respectfully submits the following Amended Complaint pursuant to Rule 15a of the Rules of the Court of Federal Claims ("RCFC").

2. The Amended Complaint is being filed as a result of the cancellation of Contract GS-07-F-0195M which was awarded to ISI on February 28, 2002.[1]. An examination of the totality of the circumstance behind the termination of ISI including the bad faith, racism and deliberate undermining of its contract by GSA

[1] See Exhibit A, CV and Declaration of Jimmy J. Jackson attached to this Amended Complaint and previously attached to Plaintiff's Request for an Equitable Adjustment, including Bates Stamped Exhibits attached on a CD Rom previously furnished to government counsel, and a motion to file the CD Rom will also be filed in addition to the Amended Complaint.

employees, led to the termination, and directly relates to ISI's entitlement to an equitable adjustment.

3. ISI submitted a damage claim on June 23, 2003 for damages suffered as a result of the General Service Administration's ("GSA") cancellation of Contract Number GS-07F-0195M for guard services for all New York State GSA sites other than those in New York City and Westchester County hereafter referred to as the "NY Contract." The procurement that led to the "NY Contract" hereafter is referred to as the "NY Procurement." That claim was denied by the Contracting Officer and formed the basis of the initial Complaint filed in this Court on December 17, 2003.

4. After some preliminary Discovery, proceedings were suspended because Plaintiff filed an amended request for an equitable adjustment dated December 11, 2006, alleging "lost profits" under the same contract. Plaintiff was also concurrently reviewing its claim which led to a revision of the amount claimed and the deletion of portions of its heretofore filed claim.

5. Plaintiff requested a suspension because its new claim asserted entitlement to "lost profits" alleging bad faith on the part of the government in terminating (canceling) its contract. Under applicable case law, primarily Apex International Management Services., 94-2 BCA 26, 842 Mar. 4, 1995. Plaintiff can demonstrate that there existed a bad faith termination as well as a subsequent de facto debarment. These were not asserted in the underlying matter currently

pending before the court, nor in Plaintiff's Request for Equitable Adjustment dated June 23, 2003, which was denied, which became the focus of the proceeding and the complaint which was filed when denied by the contracting officer.

6. When current counsel was retained, IPI retained an expert in federal procurement cost accounting familiar with federal government contract law. As this Court knows, we have repeatedly requested extensions of time to file an amended complaint, because of concerns as to supporting sufficiently the claims heretofore filed, as well as pursuing this issue of lost profits. In Plaintiff's previous requests for extensions of time, it informed the Court of the potential need to submit a second Request for Equitable Adjustment prior to its submission of its Amended Complaint.

7. Plaintiff submitted a modified claim to the Contracting Officer on January 11, 2007. This request for equitable adjustment ("REA") under GS-07F-0195M, was submitted as a certified claim to Contracting Officer Roger Pinnau and Contracting Officer Sheila Brannan, with attachments. A copy of the REA / Claim was also furnished to Mr. Poirier, counsel for Department of Justice in the pending Court of Federal Claims case.

8. The filing of the REA / Claim on January 11, 2007 followed Plaintiff's unopposed filing of a Motion to Suspend Proceedings filed on December 11, 2006, which stated that it requested suspension "because it is filing a new claim with the

contracting officer alleging “lost profits” under the same contract, which has not yet been submitted to the Contracting Officer. It is also substantially revising its heretofore filed claim and deleting significant portions of its heretofore filed claim.” Plaintiff went on to state that it was submitting the new claim to assert entitlement to "lost profits" alleging bad faith on the part of the government in terminating (canceling) its contract which were not asserted in the underlying matter currently pending before the court, nor in Plaintiff’s Request for Equitable Adjustment which was denied, which became the focus of the proceeding and the complaint which was filed when denied by the contracting officer.

9. Contracting Officer Brannan responded to the January 11, 2007 claim letter by letter dated February 8, 2007, acknowledging receipt of the certified claim submitted, and stating, “Your claim seeks damages allegedly flowing from our decision to cancel your contract on 30 days notice pursuant to clause 552.238-73, Cancellation.” The brief letter continued with a paragraph stating that ISI earlier in 2003 submitted a claim which was denied.

10. This office sent an e-mail to the opposing counsel saying we did not believe that the CO addressed the merits of the claim but if opposing counsel felt it was sufficient, then Plaintiff would consider it a “deemed denial.” Plaintiff considered this letter from CO Brannan as a deemed denial.

11. Jimmy J. Jackson, a consultant with, and the owner of Jackson Consulting, Inc. ("JCI"), provided his professional opinions on ISI's damages suffered as a result of the termination of ISI's Task Order #GS02P02CID0001, and performed a damage quantification which should be considered a replacement of the prior damage quantification. This was attached as Exhibit A to the REA and is also being attached herewith as Exhibit A. The training and unpaid invoice components of Jackson's quantification are refinements of the original claim and the lost profit components are new components.

12. After review by Mr. Jackson, ISI has reduced portions of its claim. ISI's claim filed on June 23, 2003 included a claim for training cost of $751,032.79. The revised training claim is now for $379,367, a refinement of the original claim. Attachment 7 to Jackson's Report included on the CD Rom, quantifies the Contracts Dispute Act ("CDA") simple interest of $59,585 on the training cost claim for the period June 3, 2004 through December 31, 2006. ISI's damages suffered on the "NY Contract" as a direct result of the ISI's termination are computed by taking the Lost Billable Hours previously estimated times the Marginal Profit per Hour as follows:

| Contract Year | Lost Billable Hours Guard | Lost Billable Hours Supervisor | Overtime Guard | Overtime Supervisor | Total |
|---|---|---|---|---|---|
| CY 1 | 170,551 | 20,898 | 7,384 | 969 | 199,802 |
| CY 2 | 379,579 | 46,513 | 16,435 | 2,156 | 444,683 |
| CY 3 | 379,579 | 46,513 | 16,435 | 2,156 | 444,683 |
| CY 4 | 379,579 | 46,513 | 16,435 | 2,156 | 444,683 |
| CY 5 | 379,579 | 46,513 | 16,435 | 2,156 | 444,683 |
| Total Lost Billable Hours | 1,688,867 | 206,950 | 73,124 | 9,593 | 1,978,534 |

| Contract Year | Marginal Profit per Hour | | | |
|---|---|---|---|---|
| | Regular Time | | Overtime | |
| | Guard | Supervisor | Guard | Supervisor |
| CY 1 | $ 0.393 | $ 0.470 | $ (0.324) | $ (0.523) |
| CY 2 | $ 1.683 | $ 1.742 | $ 0.902 | $ 0.665 |
| CY 3 | $ 1.598 | $ 1.652 | $ 1.159 | $ 0.917 |
| CY 4 | $ 1.598 | $ 1.652 | $ 1.159 | $ 0.917 |
| CY 5 | $ 1.598 | $ 1.652 | $ 1.159 | $ 0.917 |

| Contract Year | Lost Marginal Profit | | | | |
|---|---|---|---|---|---|
| | Regular Time | | Overtime | | |
| | Guard | Supervisor | Guard | Supervisor | Total |
| CY 1 | $ 67,027 | $ 9,822 | $ (2,392) | $ (507) | $ 73,950 |
| CY 2 | $ 638,831 | $ 81,026 | $ 14,824 | $ 1,434 | $ 736,115 |
| CY 3 | $ 606,567 | $ 76,839 | $ 19,048 | $ 1,977 | $ 704,431 |
| CY 4 | $ 606,567 | $ 76,839 | $ 19,048 | $ 1,977 | $ 704,431 |
| CY 5 | $ 606,567 | $ 76,839 | $ 19,048 | $ 1,977 | $ 704,431 |
| Total Lost Marginal Profit | $ 2,525,559 | $ 321,365 | $ 69,576 | $ 6,858 | $ 2,923,358 |

13. In addition to lost marginal profits on the "NY Contract", ISI has not been paid for all invoices submitted for services rendered on the "NY Contract." The following is a list of ISI's invoices on the "NY Contract" for which full payment has not been received.

| Invoice Date | Invoice No. | Invoice Amount | Paid | Outstanding | Act # | Service Period |
|---|---|---|---|---|---|---|
| 5/27/2002 | 60415 | $ 29,710.56 | | $ 29,710.56 | | |
| 7/31/2002 | 61664 | $ 75,478.81 | | $ 75,478.81 | PO5046768 | 02/01/02 to 02/28/02 |
| 8/31/2002 | 62525 | $ 1,066.80 | | $ 1,066.80 | PO5048902 | 08/01/02 to 08/31/02 |
| 8/31/2002 | 62793 | $ 55,409.64 | $ 50,072.42 | $ 5,337.22 | PO5046425 | 08/01/02 to 08/31/02 |
| 10/2/2002 | 63768 | $ 24,028.72 | | $ 24,028.72 | PO5046548 | 09/01/02 to 09/30/02 |
| 10/18/2002 | 64409 | $ 15,868.72 | $ 10,342.81 | $ 5,525.91 | PO5048339 | 10/01/02 to 10/18/02 |
| 12/23/2002 | 66212 | $ 29,924.46 | | $ 29,924.46 | 1B3B02056 | 10/01/02 to 10/18/02 |
| Total | | $ 231,487.71 | $ 60,415.23 | $ 171,072.48 | | |

14. In addition, ISI is entitled by the Prompt Payments Act ("PPA") to receive interest commencing with the due date of each invoice. Attachment 14 to Jackson's Declaration contains the details of the computation of $35,996.61 for PPA interest through December 31, 2006, for ISI's unpaid invoice amounts. Since ISI has not been paid for these invoices and PPA interest on them by December 31, 2006, then naturally additional interest should be included in the payment to ISI.

15. Separate from ISI's lost profits on the terminated "NY Contract;" ISI also was harmed by the loss of revenue and the associated profit on other Government contracts which ISI would have earned "but for" the "Government's "bad acts" on the "NY Contract." Because there has yet to be any discovery of Government documents in this proceeding; there is only one such contract that has been identified. Should additional such contracts be identified during discovery, Jackson anticipates revising his quantification of damages to include any such contracts. Furthermore, if based upon discovery it can be demonstrated that ISI lost any Federal contracts in 2002 and thereafter as a result of the Government's "bad acts" on the "NY Contract", Jackson anticipates revising his quantification to include the associated damages.

16. The table below summarizes ISI's four claim components and the applicable interest. CDA interest on the out of scope training damages and PPA interest on the unpaid invoices has been computed through December 31, 2006. Thus, if payment is made after that date, additional interest would be appropriate:

| Category | | Damages | | Interest | | Total |
|---|---|---|---|---|---|---|
| Out of Scope Training on "NY Contract" | $ | 379,367 | $ | 59,585 | $ | 438,952 |
| Lost Profit on "NY Contract" | $ | 2,923,358 | | | $ | 2,923,358 |
| Unpaid Invoices for "NY Contract" | $ | 171,072 | $ | 35,997 | $ | 207,069 |
| Lost Profit on "FAA Contract" | $ | 115,718 | | | $ | 115,718 |
| Total Damages | $ | 3,589,515 | $ | 95,582 | $ | 3,685,097 |

17. The one contract that currently can be traced to the GSA's cancellation of ISI's "NY Contract" is the "FAA Contract." A timeline of the "FAA Procurement" is as follows:

A. March 21, 2003 – FAA sent solicitation for "FAA Procurement" to ISI and other potential offerors for a base year and four (4) option years IDIQ contract with an expected contract start date of October 1, 2003.

B. April 22, 2003 – Solicitation required proposal submission date.

C. June 20, 2003 – Letter from FAA to ISI which connects ISI's performance evaluation on the "NY Contract" to the evaluation of ISI in the "FAA Procurement."

D. June 23, 2003 - Response from ISI to FAA's June 20, 2003 letter.

E. September 8, 2003 - Letter was sent to ISI from FAA seemingly notifying ISI of responsibility problems.

F. September 16, 2003 - Letter from ISI to the FAA notifying the FAA that subsequent to the submission of ISI's proposal to the FAA, that the Department of Labor ("DoL") had filed a complaint with ISI's outside counsel that might constitute a proposal to debar ISI. I understand from ISI's counsel responsible for the current "NY Contract" case that to the extent there were any problems with timely and appropriate payment of ISI employees on the two New York contracts referenced in the letter, these problems occurred directly as a consequence of the Government's "bad acts" on the "NY Contract."

G. September 24, 2003 - Letter from FAA to ISI finding ISI to be a non-responsible contractor as a result of the two New York contracts.

H. September 27, 2003 - Letter from FAA to ISI notifying ISI that the "FAA Contract" had been awarded to Diamond Detective Agency, Inc. ("Diamond").

Background

18. In this case a confluence of events, circumstances, and contributory venal actions came together so that the totality of circumstances, including those of various government personnel of Federal Protective Services, and General Services Administration's ("GSA") contracting and technical personnel, exacerbated by 9/11, combined, so that the government's actions in this regard meet the high standard of clear and convincing evidence of bad faith, which is another way of stating well-nigh irrefragable proof. The government personnel not only failed to cooperate, failed to timely pay but discriminated against the principal owner Ousama Karawia, an Egyptian born American citizen, referred to repeatedly by the government's chief Contracting Officer's Technical Representative ("COTR") as a camel jockey and sand nigger. In addition, GSA's pattern of extreme late payments, in excess of 30 days, and in excess of one million dollars, reaching peaks sometimes of over two million dollars, should be taken into account. ISI demonstrated it did all it could in a "bet the company" case approach to keep payroll afloat and did not do as many other companies did, fold, go bankrupt and leave its employees in the lurch. It should be stated at the outset, ISI fully paid all back due wages in the very same time period that GSA failed to pay timely proffered invoices and in addition, GSA withheld additional amounts pursuant to the direction of DoL, and further failed to release withheld amounts even as payments were made by ISI. ISI has in effect been de facto debarred since October 18, 2002, over four years, as will be explained below.

19. The record indicates that after the instant contract under which ISI operated was "cancelled", in bad faith, and a request to novate the contract was denied on the same day, ISI's subsequent attempt immediately thereafter to obtain further Federal Government contracts were denied, initially by the very same Contracting Officer who cancelled ISI's instant contract and who also denied the request to novate. She is the same CO who denied the amended REA dated December 11, 2006. Subsequent attempts to obtain other Federal Government contracts after the cancellation of the instant contract were also rejected by the government for the same reason, because of a perceived lack of “responsibility”. As the case law will demonstrate, these actions constituted a de facto debarment. The de facto debarment is based not on a lack of FSS contract schedules but a pattern of at least two denials of contracts to ISI where the contracting activities denied award finding ISI "non-responsible" under integrity and business standards. Thus in effect from the date of the cancellation of the instant contract in October of 2002 and until today's date, ISI in fact has been de facto debarred from Federal Government contracts.

20. At one point such Federal contracts were a significant revenue stream, albeit a tardy and late one for ISI. The GSA contract was very significant to ISI because the NY Federal Protective Services Contract generated more than half of ISI’s revenues. Although ISI managed to stay afloat with massive inputs of personal financial infusions from ISI and its principal, instead of as other companies have done failed to pay the employees and subsequently go into one form of

bankruptcy or another, ISI and its principals availed themselves of all personal financial resources to input into the company to keep ISI afloat and make the payments.

21. The actions of GSA and the Federal Protective Service must be taken into account. The Government's Contracting Officer's Technical Representative ("COTR") on the NY Federal Protective Services Contract, GS-07F-0195M, who wielded life and death control over operations of the company and had decision making authority approving both the payments and the timing of payments, repeatedly referred to Ousama Karawia as a sand nigger and camel jockey. Despite ISI's attempt to obtain supervisory corrective action by GSA and formal submission of complaints, GSA never addressed this issue.

22. The new post 9/11 contracts required substantial increased training, which ISI had to pay for and provide, yet ISI was subjected to frequent failure to timely be reimbursed for such payments by GSA, at the very same time that DOL demanded immediate payment of employee fringes and payments. Tabloid newspaper articles constantly played on the fact that the Statute of Liberty contract, another security contract being performed by ISI for Department of Interior, for security services was being handled by a security firm owned by an Arab American named Ousama. Most Americans, until 9/11, had never heard the name Ousama before and unfortunately ISI became a convenient pawn and target of numerous Federal and State agencies. ISI from the outset employed a team of

specialized lawyers to handle each facet of the legal problems that ensued. They retained expert labor lawyers for guidance and ISI ultimately prevailed in a decision by a New York State Supreme Court finding that New York improperly revoked its license, vindicating ISI's position. Similarly, in its attempt to collect funds due it by NY State and to guide it in its attempt to novate the contracts when it appeared that its GSA contract was threatened, it retained the highly reputable firm of Arnold & Porter of Washington DC, and was assured by GSA that if everything was in order, the novation would occur. Yet, as the facts indicate, the novation was arbitrarily denied.

23. Summary of Facts

ISI was performing the predecessor to this GSA Federal Protective Services contract beginning in 1998. The contract was competitively re-bid in 2002 and ISI submitted a bid against other firms, and after an appraisal of its overall performance, and an examination of both its Federal contracts as well as its commercial contracts, including management, overall capabilities, and its proposed prices; ISI was awarded the Contract in early 2002, for one year with 4 one year options.

24. A. 9/11/2001 Terrorists attack World Trade Center.

ISI was awarded the Federal Protective Services Contract in early 2002, as a follow on contract following a competitive bid. This was a time of anti Arab hysteria, particularly in the New York area due to the World Trade Center

terrorist attack. On June 23, 2002 newspaper articles in mass circulation tabloid New York newspapers, including the New York Daily News broke stories with headlines exclaiming that an Arab American named “Ousama” was guarding the Statue of Liberty. Instead of quelling the hysteria surrounding the newspaper articles, GSA employees, including the Contracting Officer’s Technical Representative, tapped into the hysteria and proceeded to undermine ISI’s contract, publicly and disparagingly calling Mr. Ousama Karawia a sand nigger and camel jockey, and representing to ISI employees that ISI would be terminated from the contract shortly. Ousama Karawia’s Arab ethnicity and his company’s guarding of important American symbols of freedom shortly after 9/11 caused a racial and ethnic attack against ISI by GSA resulting in ISI’s termination.

25. ISI was informed by two separate individuals, Raymond Postawa and Ralph Purdy about what Ralph Soden, COTR for GSA was telling ISI employees during their required additional training instructional classes. Exhibit 1 is a memorandum submitted from Raymond J. Postawa on July 15, 2002. Mr. Postawa was ISI’s manager for New York State. Mr. Karawia received the memo on that date and forwarded a copy on that same date to Mr. Bunce Pierce, second in command at ISI and senior VP of the firm.

26. Included as Exhibit 2 is an email sent from Mr. Ralph Purdy, President of Local 618, United Federation of Security Officer's, Inc., the union that covered employees working under the ISI contract, to Sam Karawia. The email is dated

August 27, 2002 and reports that Mr. Purdy, the Union Chief, was informed by union delegates attending training sessions at which the GSA's Contracting Officer Technical Representative, Mr. Robert Soden, referred to Ousama Karawia as a "**camel jockey**". It was reported that Mr. Soden further stated that ISI was under investigation and would soon be going out of business. Exhibits 2. Mr. Soden urged ISI employees to collect all benefits immediately, indicated that ISI's license would be lifted, and therefore its contract was in jeopardy.

"I met with the members of Local 618 UFSO in Buffalo, New York, on August 20, 2002. During the meeting some of the members were disturbed and concerned that the Federal Protective Service Officer, Robert Soden was using Federal Pay Training Section as a subterfuge to undermine International Services, Inc. United Federation of Security Officers, Inc. Sam Karawia, President, ISI, and Vice President William Pedrick, ISI. During a general discussion period, Robert Soden stated to the members of Local 618 present that the 'camel jockey' is under investigation and will be going out of business soon. William Pedrick is not in charge of the ISI/GSA contract and will lose his license in New York State when ISI gets kicked out of New York State. The union, United Federation of Security Officers, Inc. has sold out the security guards by agreeing to the Department of Labor rate in paying travel time to and from training at the minimum wage plus travel expenses when all security guards should be receiving post-rate and overtime pay. The chain of command is Federal Protective Service: ISI supervisors have no authority; they only monitor hours worked and process paperwork. ISI security guards should only take orders from FPS. Under the Homeland Security Act all ISI guards will became FPS officers and the union and Ralph Purdy are out of business. The security officer most vocal regarding these statements was Andrew Lysack and a delegate, Neil Aquino, informed the Federation of the subterfuge and the undermining of ISI and the union… this can also be supported by Kenneth Zulenski, another Security Guard who also surfaced these concerns."
Exhibit 2.

27. Mr. Soden's use of derogatory racial terms, including sand nigger and camel jockey, and his attempts to persuade emoployees by reporting that ISI was going out of business, created an hysteria surrounding the company and a distrust

among ISI employees and undermined ISI's authority. Soden's statements were completely untrue, ISI was not going out of business and ISI was committed to maintaining the viability of the company despite late payment by GSA. Despite the memo's description of the lines of authority according to Soden, in fact ISI had management personnel in place. ISI refutes the memo's assertion that the union and the company had conspired and, in fact, the parties had a good working relationship. Soden was incorrect and was clearly attempting to undermine ISI when he stated that ISI supervisors had no authority. ISI was the manager of the contract and was servicing the customer, Federal Protective Service of GSA. Robert Soden, COTR, mentioned in the memo, was the key GSA onsite manager, responsible for assigning sites to be covered, inspecting the scope of performance, determining whether the work was done adequately and having the authority to approve invoices, and determining whether the company would get paid and when.

28. Raymond J. Postawa, prior to becoming contract manager and working for ISI, was a NY State Trooper Division Chief, and liaison with the Federal Organized Crime task force. In his July 15 email to ISI, Exhibit 1, Postawa relayed what Soden was saying:

"Subject: Bob Soden's Classes.

A couple of my post commanders have told me what Bob Soden is discussing in his classes. He has stated that the state is coming after ISI for their license and that people who work for ISI on a state contract went to work one day and ISI was not there and Waskenhut (sic) was. He stated that this could happen on this contract but the guards would still have their jobs. He also stated that he thought ISI would probably not lose their license but would have to pay a large fine and

that ISI should pay it so they could keep their GSA contract. He stated that a contractor has to be licensed in this state to work on a Federal contract. He then stated that he thought ISI was falling behind with money and he thought that ISI would have problems coming up with needed money. He told the guards that they should all go out and get state registered, because if a new company comes in they may not take anyone who is not. He told them that they should do it now on their own because the company would have to reimburse them for it.

To me this is not the big issue, I feel there is some underlying motivation for Soden's informational clinics. When he called me on Friday to let me know that the conference call had been canceled he stated that the reason was that Art Dobbs was ill, when I asked him what was the matter with Art, Bob stated, I don't know old age. He then told me that Art was no longer COR. I think this was done because Art seemed to be cooperating with us in spite of the problems with the state."

29. This memo unfortunately was consistent with the Government's actions. The ethnic and racially disparaging remarks describing Karawia by Robert Soden, the (COTR), formed a basis of a complaint submitted by ISI to the contracting officer, Roger Pinnau, GSA Contracting. Although the on-site work performance was supervised by Mr. Soden, the actual contracting officer, contracting authority, was in Chicago, and some contracting responsibilities was also handled by the GSA Fort Worth Division, although the job was performed in New York State. Exhibit 3 was a submission by Mr. Bunce Pierce, ISI VP, to Mr. Pinnau, GSA Contracting Officer, stating that ISI had credible information that disparaging, inflammatory, and racial slurs were made by a U.S. Government official in front of a group of security guards in a recent training session, i.e., that is referred to in the documents. Mr. Pierce attached a copy of that email and filed a formal complaint noting that these could prejudice ISI's ability to deliver services required to the government. ISI noted that this could disrupt union relations and affect the workforce as well. ISI noted that it made similar

complaints in the past and requested an immediate and impartial investigation of the charges. Exhibit 4 was Mr. Pinnau's acknowledgment which said he was sending it and would be reviewing the matter further up the chain of command. Mr. Bunce Pierce, ISI VP, who actually requested the formal investigation by GSA stated, that no formal or informal response was ever received by ISI from the GSA, not by Mr. Pinnau as contracting officer nor any successor contracting officer. Mr. Pinnau's acknowledgment of ISI's complaints said it would be reviewed by Mr. Martin McRimmon. Again this individual never followed through nor did anyone on behalf of GSA, Federal Protective Service, or subsequently by the Department of Homeland Security, DHS, which absorbed the Federal Protective Service administering security guard. Exhibit 4.

30. As a result of a series of newspaper articles in the tabloid press, including a Daily News article dated June 23, 2002 and subsequent articles, included as Exhibits 6 - 9, including comments by Senator Schumer and New York State Attorney General, Elliott Spitzer, an audit was ordered of ISI's City and State contracts. .

31. The *New York Daily News* Sunday edition newspaper broke a non-story examining that after the World Trade Center episode, a security company run by Ousama Karawia, an Egyptian-born U.S. citizen is guarding the Statue of Liberty Exhibit 9. The article stated that International Services, Inc., has ex-cons working as security guards at the Statue of Liberty. The article played up that the security company was run by Ousama Karawia, an Egyptian-born U.S. citizen. The article

noted that the two ex-cons eluded detection because Federal security clearances had not been conducted. The article continued on to quote that Karawia, the company's CEO, insisted the guards had been issued licenses by New York State. The article quoted unnamed sources, saying the state is conducting a "very active comprehensive investigation" of the security breach, including probes of International Services and state employees.

32. This article generated a lot of bad publicity. The newspaper editor initially called Karawia's office to ask his comment and Karawia, who usually did not talk to the media, conferred with his attorney and said he felt obligated to explain that the fault lay with New York State. His attorney advised him not to talk about it because it would get twisted; but nevertheless, Karawia decided to discuss the matter with the media. Karawia explained to the paper that the fault lay with New York State, because New York State only checks the boroughs within the city impacted instead of checking the whole United States. Karawia explained the Federal contracting process that contractors who are successful bidders on government contracts fall under the guidelines of Federal Executive Orders. These Orders include binding regulations requiring the new contractor to take on prior employees and the two ex-cons targeted by Spitzer fell within that category of employees inherited from prior contractors. The reporter asked for the entire story behind ISI, and Karawia explained the growth of the company, a small start-up company, and how it grew. When the newspaper article hit, it glossed over Karawia's comments, but played up the Ousama Arab twist and generated

tremendous negative publicity. Senator Schumer was quoted in the article as being upset. The newspaper article played up dramatically the name of Ousama, a Muslim, Egyptian-born American citizen guarding the Statue of Liberty.

33. Exhibit 7 which was the second of the newspaper articles followed by Exhibit 6 continued the Daily News saga quoting “As the Statue of Liberty guard scandal spreads … at the heart of the scandal is International Services Inc., a California based security company exposed by the Daily News for hiring ex-cons to guard the Statue of Liberty and Camp Smith, an National Guard facility in Westchester County.” It concluded with saying "but no action was taken to terminate International's contract until Friday." It also quoted the fact that according to ISI, New York State was severely delinquent in payment.

34. Mr. Karawia was forced to hire a publicity firm to combat the anti Arab frenzy and as seen in Exhibit 8**,** an article ISI's public relation firm arranged to have published, which correctly noted that "ISI determined that the issue was primarily limited to one contract in which a number of administrative oversights were made with regard to security guard registration."

35. A third Daily News article dated July 12, 2002,stated that New York State revoked the license of a firm known as “Paramount Security Bureau of Jamaica” and this action followed a “Daily News investigation last month that found guards with criminal records had been working for months at the Statue of Liberty, even

though security supposedly was tightened there after the September 11 terror attacks." The state charged the California-based company that employed the ex-cons, International Services, with using 208 unregistered guards and moved to revoke its license." Exhibit 6, p. 2**,** July 12, 2002, Daily News Edition.

36. Thus, we have a series of four newspaper articles beginning June 23, 2002 in the New York Daily News, June 28, 2002 in the Business Review, June 30, 2002, in the New York Daily News and July 12, 2002 in the New York Daily News, all focusing on the Statue of Liberty contract by an Arab-American firm whose principal was Ousama Karawia lumping ISI together with a number of other firms whose licenses were then revoked.

37. ISI then hired a public relations firm, APCO Worldwide of Washington, D.C. ISI hired the firm to try to present a more accurate and objective approach, so that any future stories would carry both sides.

38. Exhibit 5 is New York State's initial complaint to revoke ISI's business license. The Complaint alleged failure by ISI, was clearly a reference to ISI's Federal contract. This action by NY State raised concerns about how to protect its Federal Contract. Karawia, within the space of a week fully informed the GSA contracting officer, Roger Pinnau, in Chicago, of the actions taken to date and how ISI viewed them and that ISI would fully defend itself against the State's allegations, and take all measures to protect its performance under the GSA

Contract. Exhibit 10. The timeframe when this occurred can not be over emphasized. Newspaper articles, which occurred on June 23, 2002, June 28, 2002, June 30, 2002 and July 12, 2002, were followed by the initiation of the revocation of the license proceeding, See Exhibit 5 dated July 19, 2002, followed by Postawa's memorandum dated July 15, 2002, Exhibit 1 and ISI's notification to GSA CO., Exhibit 10**,** dated July 1, 2002. In notifying Mr. Pinnau, ISI recounted New York State's civil complaints and attempts to revoke the license, that ISI was totally cooperating with New York State, and would contest the forthcoming New York State proceedings on the revocation of the license. Karawia wanted to assure the Contracting Officer that these legal matters would in no way affect ISI's GSA contract or its ability to provide services. Mr. Pinnau responded immediately the same day, July 1, 2002, thanking ISI for that information. Exhibit 11.

39. In response to Exhibit 5**,** New York State's complaint to revoke ISI's state license, and Bill Pedrick's, ISI NY's managers license, ISI hired Mark Baker, attorney from the Washington DC labor law firm, McGuiness Norris, & Williams, LLP, to contest that proceeding. The New York State Administrative Judge then unilaterally accelerated the hearing date and ISI's counsel objected to the accelerated date. ISI hired additional counsel after Mr. Baker's request to the administrative judge of the New York State Department of State contesting the acceleration of the date was denied. Exhibit 13. Mr. Baker also pointed out in Exhibit 13 that apparently the Attorney General's office was leaking information

before even supplying it to ISI or its counsel. Mr. Baker in Exhibit 13 after noting that the State "has made ISI the target of some very bad publicity in the New York media over the last several weeks" termed unfair the state's attempt to expedite and accelerate the hearing by six weeks. Mr. Baker also pointed out that a TV channel reporter from Albany on July 16 in an inquiry to ISI referred to August 2 as the new hearing date which ISI thought was an error but now noted that since the TV station was aware of the accelerated new date before ISI, NY's actions were highly prejudicial for the Attorney General's office to be leaking this information to the media before notifying ISI or it's counsel. Note: recent articles in the New York Times indicates that now Governor Spitzer's office is on the receiving end of investigations involving similar smear tactics against his political opponents.

40. New York also sought a civil proceeding seeking a refund for payments made to ISI which ISI countered and demanded payment alleging funds still due ISI from New York State. As will be discussed in further detail below, ISI obtained a Court decision finding New York's attempt to revoke its license arbitrary and capricious and a violation of the New York State Constitution. With respect to the civil proceedings for alleged refunds sought by New York, in fact, a net payment was made to ISI.

41. The record reflects after New York State initiated proceedings both administratively to revoke ISI's license, ISI took protective steps by opposing

both lawsuits. This demonstrates ISI's attempt to obviate any difficulty occasioned by any potential loss of a license in requesting from GSA a Novation assigning the contract it had with GSA to another contractor while remaining fully financially and managerially responsible.

42. Mr. Karawia met with the Contracting Officer, Mr. Pinnau in Chicago to discuss the issues and the difficulties with the New York State Contract, the National Park Service Liberty Contract and the resulting media attention. Mr. Karawia, also in anticipation of any potential difficulties with respect to his license requested the possibility of a Novation agreement. This meeting occurred on or about June 27, 2002 in Chicago.

43. Mr. Pinnau in a letter dated July 18, 2002 thanked Mr. Karawia for his candid presentation and statement of events and his request for a Novation agreement. Exhibit 12. Mr. Pinnau provided extracts of the Federal Acquisition Regulations that specifically discussed novation agreements and procedures and referred him to a Ms. Sheila Brannan, the contracting officer who would be handling that matter, and was located in Fort Worth, Texas. Exhibit 12 had as an enclosure an abstract from the Federal Acquisition Regulation requirements that set forth all the documents that had to be provided concerning the transferor which would be ISI, including the specific legal supporting documentation. The regulations also noted that the transfer that had to be made and counsel opinion letters had to be furnished showing such transfer was proper and effective under applicable law,

balance sheets of the transfer and transferee audited by independent accountants, certified copies of the board of resolutions and minutes of each corporate shareholder's meetings proving the same. The regulations provided that if the CO recognized the novation, that while a transferee would assume all the transferor's obligation with the transferor waiving any rights against the government under the contract, the transferor would guarantee performance of the contract by the transferee. Karawia hired a nationally reputable firm in Washington, D.C., Arnold & Porter, and paid them approximately $25,000.00 to prepare the necessary documents required under the FAR for a novation and submission of the same to the Federal Government.

44. New York attempted to revoke ISI's license, with an ex parte proceeding only to have ISI immediately file an Article 78, the New York State equivalent of a Temporary Restraining Order, which it obtained, which vacated an Administrative Law Judges revocation of ISI's license. This proposed revocation order was dated September 12, 2002 to be effective October 15, 2002. Exhibit 17. The Order to Show Cause dated October 1, 2002, Exhibit 21, had the effect of keeping and maintaining ISI's license totally and fully in force; but, by then the momentum had reached a resounding, unstoppable, dooming effect.

45. New York State initially attempted to revoke the licenses with a Complaint dated June 26, 2002 and amended July 19, 2002. On the New York State licensing procedure, Karawia notes that he had requested an extension of time in order to

obtain counsel in light of New York State's acceleration of the hearing date. The administrative judge refused and the hearing proceeded on August 30, 2002. At that Hearing, the law firm of Ingber & Ingber, representing ISI, which was local in New York, was substituted as counsel and requested an adjournment. That request was also denied and another special counsel appeared for the sole purpose of requesting an adjournment, such request also being denied. The State put on its case and the Administrative Judge, by decision dated September 12, revoked the license effective six weeks hence, October 15, 2002. See Exhibit 17. ISI then immediately hired another law firm which was able to obtain a Temporary Restraining Order which vacated the administrative law judge's decision, Exhibit 17, dated September 12, 2002. The NY State Court decision was dated Oct 1, 2002. This decision vacated the revocation of ISI's NY license**.** Exhibit 21, first page has a stipulation to adjourn, which was dated October 24, 2002, which carried forward the effect of the Court's Order to Show Cause and findings dated 1 October, sufficiently in advance of the effective date of the revocation of the license which the prior administrative law decision had said would be effective October 15. The New York State Temporary Restraining Order Exhibit 21, which again continued to be carried forward by various stipulations between New York State and ISI counsel, found that the Administrative Law Judge's decision prospectively revoking ISI's license Exhibit 17, was unconstitutional both under the United States Constitution and the New York State Constitution. The Court's decision, Exhibit 21**,** revoked the administrative law decision "on the grounds that Petitioners had demonstrated a likelihood that they will succeed on the merits of

their Article 78 petition and further on the ground that the Petitioners would be irreparably and permanently harmed by the failure to grant such stay." It gave time for the respondent, i.e., New York State, to provide opposing papers. New York State instead continued to enter into stipulations to adjourn, first page of Exhibit 21**.** Mr. Karawia was particularly happy as a result of the New York State Article 78 Order to Show Cause Temporary Restraining Order because GSA was delaying ruling on the Novation and getting this Temporary Restraining Order kept him in business in New York State. New York State's business in total was 55 percent of his overall business. ISI had a Department of Homeless Shelters' contract of approximately $10,000,000.00; OTB, Off Track Betting contract; Statue of Liberty contract and the GSA contract. ISI ultimately settled with New York State, Exhibit 32 and received a net payment due of $700,000.00.

46. ISI followed up after submitting its required paperwork for the Novation with a communication dated August 20 by Bunce Pierce, its vice-president, to the Contracting Officer's assistant requesting who in GSA Legal would be involved so that ISI's attorneys could liaison with them to expedite ISI's request for the Novation**.** Exhibit 14. ISI labeled its concern of importance "high" on this communication. Ms. Theresa Hill, the GSA contract specialist, who works under the direction of a contracting officer, responded by Exhibit 15 stating that the FAR requires what is called an open ratings report. This is a Dun and Bradstreet report and included high past performance ratings, ISI then submitted the balance of its Novation documentation, Exhibit 16, again requesting the expediting of the

Novation document with a goal of August 28, 2002 by its email dated August 27, 2002. This was submitted to Sheila Brannan, the Contracting Officer at GSA, Fort Worth, who Mr. Roger Pinnau, Contracting Officer, Chicago, advised would be responsible for reviewing the Novation request.

47. During this time period, from the time that New York State moved to revoke the license up until ISI was able to obtain a temporary restraining order, ISI was doing all it could to obtain approval of the Novation in the event it was not successful in maintaining ISI's license. ISI's then in-house counsel, Konrad Trope, wanted to insure legal sufficiency and was asked by Mr. Bunce Pierce as counsel to contact his liaison at GSA counsel's office. Trope called Mr. Bill Lair, Sheila Brannan's supervisor, who said that the file was with Ms. Brannan and he did not see a problem unless the legal department had some objection. Mr. Lair said ISI could expect a decision within a day or so of September 17, and Trope volunteered that if there was any problem, he would get on a plane and fly down to Fort Worth to correct the situation. Exhibit 18. As of the date of this communication, Exhibit 18, the revocation of ISI's New York license was not yet effective October 15, 2002.

48. GSA through Sheila Brannan, Contracting Officer, Fort Worth, Texas denied the request for a Novation despite the earlier assurances by the GSA legal team. Ms. Brannan stated it was not in the government's interest to novate the contract. Exhibit 19. Ms. Brannan provided no substantiations, justifications, reasons or

clarifications and concurrently also canceled the Contract effective October 19, 2002. Exhibit 19. This was a shock to the company since GSA had never raised any concerns about the adequacy of the paperwork or alleged any failure to comply with any of the FAR's requirements. This was financially devastating for ISI since it was ISI's largest contract and largest government contract.

49. GSA's letter of September 19th canceled the contract effective October 19th. Exhibit 19. Konrad Trope consistently repeatedly by letters, faxes, telephones, before the effective date of the cancellation, attempted to get GSA to revoke its decision and again on October 8th as seen in Exhibit 23, repeated the request to have GSA maintain the contract and again on October 8th at 12:54 p.m., after having earlier emailed her at 10:06 a.m., Exhibit 23.

50. ISI by fax**,** immediately contacted Sheila Brannan, CO, providing the NY State TRO imposing the stay of the vacatur, requesting reconsideration of her decision to terminate the contract. Exhibit 20. Mr. Trope, ISI's then inside counsel thereafter in further telephone conversations again focusing on the fact that the New York State Court found a likelihood of success of merits, requested GSA to reconsider its decision. Exhibit 22.

51. Just prior to February 28, 2002, the date ISI was awarded the contract, it had received excellent ratings. The fact that ISI won the contract on February 28,

2002 in a competitively advertised bid against other contractors was consistent with consistently positive performance ratings given to it up until that date.

52. ISI challenged the "cancellation" of the Contract as opposed to terminating it for convenience. However, ISI's position was that the Government should not have ended the contract no matter the verbiage. In addition to the loss of revenues there were other significant financial adverse consequences. ISI explained to GSA that with respect to the GSA contract that was "cancelled," it initially thought it would be entitled to the lost profits for the portions remaining on the contract that were cancelled including cancellation of the option years but was advised by the Government that it was not entitled to lost profits. ISI had threatened to sue for these "lost profits" but upon being told by the Government it could not receive the same, submitted a claim for certain costs which was superseded by its amended REA dated December 11, 2006.

53. ISI had requested the Court to suspend the pending case because it was superseded in its claim adding a new element which had not been previously submitted to the Contracting Officer concerning the element of lost profits. ISI is claiming lost profits on the New York contract, and the FAA contract.

54. Based on the quantification of the lost profits and the fact that Plaintiff believes it has proved a bad faith termination, Plaintiff believes it is entitled to the lost profits which have been quantified by an outside cost consultant expert in government contract matters, Jimmy J. Jackson. However, with additional

discovery, and because of ongoing further fact finding ISI will allege additional lost profits for additional contracts it was precluded from applying for.

55. Current counsel advising ISI has advised the company that under existing case law, the Plaintiff is entitled to breach damages or “lost profits” and that the company can establish the governments conduct was in bad faith in canceling the contract and subsequently de facto debarring the Plaintiff.

56. ISI attempted to communicate with Sheila Brannan the contracting officer who canceled the contract to immediately advise her of the Temporary Restraining Order obtained which stayed any revocation of the license. This was to no avail.

57. Mr. Karawia characterized the period from September 19, 2002, the date of GSA’s notice of contract cancellation effective October 19, as a 30 day fire drill. Employees did not know if they were coming or going or the company was going to be there, whether they would be getting paid, getting mixed signals from Bob Soden, while at the same time ISI was trying to calm the employee workforce down, at the same time having to combat the licensing revocation and New York State’s civil proceedings. Karawia explained that New York State indicted numerous executives, ISI had to hire individual lawyers, Sam Karawia was named personally and things were extremely hectic. GSA’s response to ISI’s inquiries and requests for payment was to ask ISI to re-transmit the same invoices.
Mr. Pinnau, after noting that GSA internally transmitted them, nevertheless again,

requested updated invoice numbers and details so it could assist GSA payment offices as of November 3 to track the progress of specific invoices. GSA's position was if an invoice was "being worked on" by GSA, it could not be considered "late". This kind of explanation of why payments were not late or actually not" withheld "is an Orwellian demonstration which does not refute the fact that invoices were not timely paid. Mr. Pinnau then addressed several ISI payment requests and requested further involvement and assistance from ISI to assist GSA in tracking down outstanding delinquent or missed payments as of November 3, 2002. Exhibit 24.

58. In November, 2002, GSA was delaying payments to ISI on invoices well in excess of 30 days and for significant sums, upwards of a million dollars. Exhibit 34**,** With respect to GSA's request and notification that it was internally retransmitting invoices from ISI and requesting ISI to submit invoice duplicates, Karawia characterized these last couple of months of the contract that GSA "they were squeezing us like – we were not getting paid". Karawia explained, "They did it a lot more towards the end. Karawia explained that GSA's position was invoices were not late if they were worked on.

59. With respect to the previously directed "withheld amounts," GSA CO Pinnau first notified ISI by Exhibit 28 that it is working on getting a list of the "DOL-Release ISI upstate New York invoice payments." The letter is from Mr. Pinnau to Peggy

Orlando. Prior to this document, ISI and Mr. Karawia had never been informed that funds had been formally "withheld."

60. Despite the tremendous tension as Mr. Karawia describes in the month between the notice of cancellation of contract and the actual termination date of the contact, the preceding hectic months, ISI was attempting to try and get paid, yet had to constantly furnish information already previously furnished to GSA again, in order to get paid. Exhibit 25, a letter from GSA the contracting office in charge of payment dated November 4, 2002 to Peggy Orlando states:

> I am writing to ask you for more information so we can make more progress towards contract past order closeout, in upstate New York. Please feel free to share these questions with Bunce and Sam. Thanks. 1) How much to you think we owe ISI, as of this date? We can use the information as a check on our own numbers. It will help us work towards a reconciliation of any differences in amounts.

61. Karawia explained that in addition to requests for payment for outstanding invoices as of mid 2003, months after contract termination, ISI submitted claims for certain capital expenditures as well as additional amounts incurred under the contract. ISI's initial letter claiming entitlement to damages as a result of the governments cancellation was first submitted on January 14, 2003, ,where ISI first thought it was entitled to consequential damages, ie. Lost profits. Exhibit 26 attached therewith a schedule of alleged payments due and contemplated seeking the full value measure of the gross dollars of the contract. ISI was told by the Government that it could not claim lost profits while GSA was taking the position that under the "cancellation" it was not required to make any payments. Exhibit

26 was later supplemented by a formal certified claim submitted which is being superseded by this claim.

62. An example of the hysteria surrounding 9/11 and the effect on Mr. Karawia, a foreshadowing of the general climate in the coming months and GSA behavior toward Mr. Karawia, is what occurred to Mr. Karawia on 9/11 at the Buffalo site. He had set up a meeting with all staff employees in the Buffalo Federal Building, facility while staying at a Holiday Inn in Hamburg, a suburb of Buffalo. Earlier that morning on September 11, 2001 he was attending a deposition in the Buffalo area when news was received that the World Trade Center in NYC was hit. Karawia went down to the hotel lobby and had some discussions with hotel staff about the evacuation in New York City, even evacuating the Statute of Liberty. Karawia mentioned to the hotel clerk that his firm did the security work for the Statute of Liberty assuring him that ISI had good qualified people on site. Mr. Karawia requested a cab to be called to go to the Federal Building in Buffalo, New York. Mr. Karawia went back to his room and then received a phone call telling him his credit card was no good. Apprehensive since he did not believe this to be the case, he went downstairs when he noticed two plainclothes policemen standing in another corner and the situation seemed that there were just too many people in the locale. He handed his credit card to the clerk when the people he noticed pulled their jackets showing FBI vests with bulletproof markings and automatic weapons telling Karawia to keep his hands up. They want to know what the packages were that came Fed-Ex to his hotel. Karawia

provided his I.D. and explained the Fed-Ex packages were training manuals and explained that he actually had guards at the Federal Building where the FBI had their offices. The police asked if Karawia would permit a search of his room and told him to keep his hands up in the air. Karawia testified this was a period of severe stress. He was asked to provide names of his employees and while stressed out had to call Bill Pedrick, his New York contract site manager, to give names and gave his cell phone to the FBI agent who spoke to Pedrick. Karawia explained they could search his room and look through his Fed-Ex packages which were the manuals. Karawia explained that one of the FBI agents was a bomb expert who was checking it out, who extracted some of the packages which finally confirmed that these packages were the actual Training manuals that Karawia previously explained. The agent finished the conversation with Bill Pedrick, apologized, but Karawia insisted they search the entire room and suitcases. The security police explained that because of the combination of events, that his firm was guarding the Statute of Liberty and he wanted to go to the Federal Building, his name, Ousama Karawia, that when he requested a taxi, the Hotel clerk called the FBI. Karawia explained from 9/11 on he believed his disaster was foretold.

63. ISI, despite the cancellation under the instant contract and its belief the same should not have been canceled, continued to seek to obtain other individual stand alone Federal Government contracts as well as to apply as a contractor under the Federal Supply Schedule (“FSS”). ISI is alleging a “de facto “debarment not

because it was not placed on the FSS schedule but because of a repetitive pattern of at least two instances in which individual Federal Contracting Officers found that ISI did not possess the requisite "responsibility" and "integrity" necessary for a government contract. While the government is free to debar and suspend contractors, it must afford them the due process rights unto which they are formally proposed for debarment and afforded the opportunity to contest the same and only after such a finding be debarred. The government cannot on a piecemeal individual basis render findings of lack of responsibility and thus deny a contractor a Federal Government contract on those grounds. Such actions constitute de facto debarment.

64. What has occurred however is nevertheless based on a pattern of being denied subsequent Federal Government contracts by GSA and thereafter later on by the Federal Aviation Administration, see discussion later, based on instances of alleged lack of integrity and performance due to the underlying GSA contract, in effect since the date of October 18, 2002 and actually one month prior that September 18, 2002 when the contract was cancelled until today's date ISI, its affiliates and any companies in which Ousama Karawia is involved with have been in fact de facto debarred. Case law demonstrates that if on two occasions the government finds a contractor to have a lack of responsibility and integrity such conduct constitutes de facto debarment.

65. Exhibit 27 was ISI's attempt by counsel immediately after conclusion of the instant contract cancellation to reapply to get on the FSS schedule and reinstated so it would be eligible for future Federal contracts, with a request to obtain the process of "reinstating our company on the FSS." Exhibit 27 is dated January 22, 2003. "We will follow them to the letter and reapply immediately."

66. ISI was still concerned because Ms. Brannan was the Contracting Officer who denied the Novation and also cancelled the predecessor contract, and so requested that someone other than her be assigned to review its current request to be reinstated on the FSS schedule, Exhibit 29. This request posed to GSA was denied by GSA Fort Worth stating, “My decision to assign your offer to Sheila Brannan is unchanged,” Exhibit 30, February 11, 2003. Shortly thereafter Bunce Pierce placed a phone call to GSA and reported back to ISI that he was told notwithstanding GSA’s denial of reassignment of the matter from Brannan, Ms. Carol Bates, Sheila Brannan’s boss, thought Sheila Brannan would provide ISI a fair evaluation, Exhibit 31 is ISI’s open ratings past performance evaluation, which was previously submitted as part of its Novation documentation and again pursuant to its request for reinstatement. Exhibit 31 is Dun & Bradstreet Open Ratings, which GSA requested and relied on. It is not what the general public thinks of as a “credit report” but is a specific definitized report required by GSA of all vendors to establish their ability to perform on government contracts. GSA specifically requires a Dun and Bradstreet “past performance evaluation” of all new vendors. A review of the detailed performance ratings against a average

chart level shows ISI received a rating of 85, which is 4½ circles out of 5, a significantly superior rating. On reliability, it ranks approximately: Cost, 85 percent; order accuracy, 80 percent; delivery timeliness, 80 percent; quality, 80 percent; business relations, 80 percent; personnel, 85 percent; customer support, 80 percent and responsiveness 85 percent.

67. Despite these ratings, on May 1, 2003, which is the first time after the instant contract was cancelled/terminated, Ms. Sheila Brannan, the very same individual that ISI was concerned about reached the following conclusion in finding of a lack of responsibility:

> Dear Mr. Pierce, this is in regard to your proposal submitted in response to solicitation No. 7FXP-D4-01-0539-B, dated January 1, 2003.
>
> Federal Acquisition Regulation (FAR) 9.103(b) states, 'No purchase or award shall be made unless the Contracting Officer makes an affirmative determination of responsibility. In the absence of information clearly indicating that the perspective contractor is responsible, the Contracting Officer shall make a determination of non-responsibility . . .' Further, FAR 9.104-1c and d states in part, 'A contractor must have a satisfactory performance record . . . , and (d) Have a satisfactory record of integrity and business ethics.' It has been determined that International Services, Inc. does not currently meet the requirements of FAR 9.104-1c and d. Accordingly, a non-responsibility determination has been made. International Services, Inc.'s proposal to perform security guard services to the Federal Government is rejected and will receive no further consideration. Sincerely, Sheila Brannan, Contracting Officer, (7FC1-E5)."

68. As counsel specializing in government contracts and in particular government contract issues of integrity and responsibility determinations, as lead counsel in and responsible for the *Garufi* case at the United States Court of Appeal for the Federal Circuit, Impresa Construzioni Domenico Garufi, 238 F.3d 1324, 1332

(Fed.Cir.2001), which led the General Accountability Office (GAO) to revise their regulations to consider challenges to responsibility and non-responsibility determination. See Exhibit 44, such a finding by Ms. Brannan together with another subsequent second finding by the FAA later on constitutes a de facto debarment. This, while the DoL formal debarring proceeding was ongoing and not yet concluded. Under DoL regulations a firm is not debarred until the conclusions of all appeals internally within DoL. There is currently pending an appeal within the Administrative Review Board within DoL and therefore no formal debarment has been instituted by DoL. But as has been shown, ISI has been defacto debarred and precluded from receiving contracts. Further, unlike DOD suspension and debarment proceedings, there is no immediate institution of a suspension from receiving government contracts pending a notice of proposed debarment up until the point of a formal debarment. Yet, the contracting officer de facto debarred ISI and its affiliates which had the same equivalent affect. This time period ran from September 18, 2002 to the current date.

69. GSA Late Payment Issue

Exhibit 35 is an aging report history showing as of May 2002 GSA owed a peak of $3.5 million. DoL took the position that regardless of whether GSA was late in payment ISI had to outlay the money. It is simply ludicrous not to consider the government's failure to promptly pay on ISI's ability to timely pay its employees and employ additional support staff to assist in doing so.

70. Exhibit 34 is an aging report of a compilation of amounts owed from GSA from January 31, 2001 until June 30, 2003. As of June 30, 2003 some eight months after termination of the Contract GSA's still owed the amount of $229,316.67 solely for services rendered. Karawia explained that as of the last day of the contract 10/31/2002 on page three of that document, Exhibit 62, second column from the right, the amount of $1,989,413.55 was currently billed. No further work was performed nor billed for after October 18, 2002 yet by November 30, 2002, $1,063,940.69 over 30 days was delinquent to ISI. Note this is exactly during the crunch period when DOL could not stop writing letters demanding payment while at the same time directing withholding of payments with DOL asserting that only approximately less than $150,000.00 was "withheld" pursuant to its direction. Yet the numbers actually indicate that in excess of a million dollars was not paid and was late and in excess of 30 days as of November 30, 2002. On the next page December 31 $351,968.17 was aged over 60 days and this is the time period at which the purely "directed" withheld amounts were being frozen and not released despite ongoing payment by ISI to its employees with DOL not authorizing release until January 31, 2003 and even at that point there was close to $400,000.00 that was over 30 days owed. As of December 31, 2002 with no additional billing occurring after October 18, the GSA still owed in excess of $1 million.

71. Aside from the ordinary "routine" difficult financial periods, in an attempt to further pinpoint when there were specific peculiar "crunch periods" Karawia

explained the following. There were a couple of crunch periods May 31, 2002 which is when the new contract actually started although awarded in February it began April 1, 2002. At this time GSA owed money against the old invoices on the prior contract as well as for work performed in April for the new contract with the highest peak point owed of $3,532,390.91. Mr. Karawia explained the company had no cash, was borrowing money from multiple banks, the company was technically in default because it was borrowing more than ISI's receivables. The second crunch period was June 30, 2002 at which point $2,603,695.79 was owed with GSA starting to pay a little bit in August. In August the sum goes down to 1.3 and then in October everything stopped again with the amount going up to close to two million dollars $1,989,413.55 with the money totally stopped in October.

72. Mr. Karawia explained he is only permitted to assign for financing purposes under his government contract to a reputable, recognized financial institution as permitted under the Anti-Assignment of Claims Act of the United States Code. Karawia explained how he financed his government contracts and why he ran into difficulty as a result of GSA's late payments, withheld payments, etc. As an example, at the end of the month, after working on a GSA contract, he would invoice GSA for $1 million for services rendered during that one-month period. ISI would take that invoice and go to the bank, and borrow against that underlying agreement for which ISI would receive 85 percent of the invoice from the Bank for the invoice it submitted to GSA. Once ISI received that money from its

financial institution it would pay its employees, payroll taxes and other expenses. Upon receipt of payment from GSA for that $1million invoice, the amount under the assignment goes directly to the bank receiving the $1milliion from which the bank deducts the $850,000.00 it had already advanced ISI as well as the fees they charged to finance the contract and resubmit the net difference to ISI. After another 30 days goes by, and ISI submits another invoice for the second month, it then repeats the process, in effect borrowing 85 percent of the second invoice against the invoice and thence on. However, the master agreement with Wells Fargo required that if ISI does not get paid the Number 1 invoice from the government, i.e., the first in this scenario of three, on time, Wells Fargo then considers all three invoices delinquent and Wells Fargo is now permitted to take money from any other source for which ISI is using the master credit agreement whether it is a government contract or not. Thus, when GSA was late, that created a delinquent receivable. Once that happened ISI could not borrow any more on any subsequent invoices, and Wells Fargo offset against any other customer contracts which have been paid. GSA's contract with ISI required it to pay by 30 days, but also required under the Federal Acquisition Regulations, that by law if ISI offered a prompt payment discount, GSA had to take the discount and make payment within an expedited two-week period. ISI attempted in every instance to provide the prompt payment discount to GSA so it could expedite payment within a 15-day provision. Karawia explained that when GSA began to be delinquent in its payment, it affected all of ISI's customers, including non-governmental customers. After 90 days Wells Fargo would take the funds that

were remiss as a result of late payment by GSA from other contracts, which also had the effect of Wells Fargo refusing to further finance ongoing GSA contracts. ISI initially had a term loan from Wells Fargo that fronted the up-front startup costs, which became delinquent as a result of payment by GSA for its initial startup of $1.5 million under a term loan. It had to go to cover the new training and equipment requirements as a result of the post-911 requirements and which is required to be performed by ISI employees in the very first upfront portion of the contract. Mr. Karawia explained to fund the balance of the contract he refinanced his personal home and assets and borrowed $2.5 million personally as well as every source that ISI and its entities could borrow from. Mr. Karawia explained he personally borrowed $8.5 million to put into the contract. He borrowed from other banks as well. He explained the company borrowed $3.7 million, which he is personally responsible for, as well as $4.8 personally so that there is a total owed of $8.5 million between the companies and the banks. His personal bank was Alliance Bank, for which he is personally responsible, as well as Wells Fargo. He leveraged his office buildings and is a re-payment plan with the IRS for $1.8 million due. Rather than go bankrupt and not pay employees the substantial dollar amounts for which DoL asserted various requirements under the statutes, albeit sometimes late, ISI chose to make all those payments and not leave the employees on the hook, despite the fact that at least by way of analogy to a "perfect storm," a confluence of events occurred. The entire bad faith situation with Ralph Soden in the post-911 atmosphere, calling him a sand nigger and camel jockey, increased substantial training requirements and staggered work

assignments, substantially materially late and nonpayment, conflicting directions by DOL to have payments "withheld" while at the same time directing ISI to make those very same payments at a point in which other payments had not yet been paid, with DOL and GSA drawing nonsensical distinction between payments not yet made which would not be considered "withheld payment" only those payments specifically set aside pursuant to a specific proviso to be withheld would be considered "withheld", all the rest in excess of the $1 million times $2 million not being paid would just be considered unpaid, but not withheld. Despite this, with employees doing all they could to get paid in the last 30 days of the contract performance period, as well as in the three months hence after contract was completed, when they were no longer ISI employees, but absorbed by the successor contract, ISI put every cent it could lay its hands on and kept the company afloat until today, it is paying out in stretches portions of the funds as well as deferred payment agreements with the IRS. ISI paid 100 percent of all funds owed to the employees.

73. Raymond Postawa, currently working for the New York State Dormitory Authority, was employed by ISI from approximately 1998 until 2002. He was a New York State Trooper from 1973 to 1997. He began as a uniformed trooper, then became an Investigator, subsequently an Investigator Detective from 1982 through 1987. In his role as a Investigator Detective he was involved in many high-profile investigations, homicides, sexual abuses, liaison with Organized Crime Task Force, assigned to the New York State Investigation Commission for

the Mob and Construction; Organized Crime Task Force. He was a senior investigator and an active unit coordinator. He retired in 1997 and began work with ISI starting as a nighttime supervisor on the midnight shift. His direct supervisor was Bill Pedrick.

74. Postawa examined Exhibit 1 which he drafted personally and sent to Bunce Pierce and Sam Karawia. Postawa stated that the GSA and the Federal Protective Services created "an atmosphere towards the company. I don't know why but they did. They didn't make it a secrete (sic) that they didn't like ISI for some reason." Exhibit 43 Transcript Postawa Deposition in Lieu of Testimony, Page 9, Line 5 through 8

75. Postawa explained the interface and roles of the various entities. Exhibit 43 "Postawa Transcript Page 9, Line 14:

A. Well, they would make disparaging remarks about the company and they made no secrete about it. You got to realize the atmosphere that the guards work under. An FPO, Federal Police Officer, could remove a guard for no reason. It's tantamount to going into a barber shop and saying, I don't like this barber, I want to wait for that barber. If they didn't like a guard for some reason, they didn't have to give an express reason. They could go to the chief and say remove that guard. They called the company up and say, that guard has to be removed. The guards always wanted to garner favor with the FPO's and the FPO's were badmouthing the company. So, the guards, to garner favor, would have a little animosity toward the company, too.

Q. When you say they on behalf of the Federal Protective Services, what individuals are we talking about?

A. Well, it was mostly Joe Kanopka and Bob Soden. The everyday guards weren't really that bad. But, for some reason Joe Kanopka and Bob Soden didn't like ISI.

Q. Joe Kanopka, he was the chief of the Federal Protective Services responsible--

A. That's correct, and Bob Soden was the COR, the contract representative.

Q. So, Bob Soden had the most direct relationship with ISI employees?

A. Yes actually not the employees, per se, but the management.

Q. And since the two, these are the two top individuals that we are talking about?

A. Right.

Q. Would those feelings work their way down to everybody so it became known to everybody?

A. Of course, because like in any kind of police job, everybody tries to garner favor with somebody up at the top; so naturally, Soden and Kanopka are not liking the company, and then other FPO's are not going to like the company either for whatever reason because they want to garner favor with the chief. I don't know Soden would be the number two guy, but he was always in the office with the chief.

Q. When I say he's number two, that's because his title was the Contracting Officer's Technical Representative?

A. Right.

Q. Typically, he would have more interface or hands-on with ISI employees and management?"

Postawa Transcript Exhibit 43 Page 9, Line 14 through Page 11, Line 13

Roger Pinnau

76. Roger Pinnau testified on February 11, 2005 that he was currently employed by the Federal Protective Service, a division of Homeland Security, as a Contracting Officer for probably about ten years. He previously was with GSA. Mr. Pinnau testified that a contractor, if removed from a Master Federal Supply service

contract, could still "bid" on Federal service contracts. Exhibit 45 Pinnau Deposition, Page 5, Line 17.

77. Mr. Pinnau testified that prior to testifying at the deposition that day he reviewed the CCR which is a government's contract central registry that there currently existed a company known as International Protective Services, doing business as International Services located in Torrance, California. Exhibit 45 Pinnau Deposition in lieu of Testimony, Page 7.

78. On cross-examination, Mr. Pinnau admitted that GSA maintains what is referred to as an Excluded Party List ("EPL"), which is a list of currently formally debarred contractors. Exhibit 45 Pinnau Deposition, Page 8.

79. Mr. Pinnau understood that the EPL list was a list of "formal" debarred contractors. When questioned as to whether he understood what a de facto debarment was, he understood that although a company may not have been formally debarred they can have, in fact been debarred by other governmental actions, i.e. de facto debarred. Exhibit 45 Pinnau Deposition, Page 9, Line 7.

Q: So a de facto debarment is something that occurs when, by the actions of the government, although they haven't formally debarred, they have, in fact, debarred by their actions. So I'll -- do you understand that?
A: Yes, I understand what you are saying.

Q: And when someone is de facto debarred, a number of courts can find that is illegal or improper because the government has informally -- and I want to spell the word, f-o-r-m-a-l-l-y, followed the procedures that exist in the Federal Acquisition Regulations. So do you understand the concept.

A: Yes." Line 23.

80. Mr. Pinnau understood that the word "responsibility" was a term of art in government contracting. "Responsibility" among other things required a contractor to have the necessary integrity to perform on a contract. Exhibit 45 Pinnau deposition, page 12 and 13.

81. Mr. Pinnau recollected that the FSS schedule contract between GSA, FSS and ISI was canceled. Referring to Exhibit 19, a letter from Sheila Brannan, whom Mr. Pinnau remembered, was the letter from Sheila Brannan as the Contracting Officer which canceled ISI's contract effective October 19, 2002. Mr. Pinnau remembered that the Contract was canceled. Exhibit 45 Pinnau deposition, page 16, line 10. Mr. Pinnau could not actually remember if he heard about it or not, but he may have "Pinnau deposition page 18, line 12.

82. Pinnau said he wasn't sure if he heard later that Brannan subsequently found ISI non-responsible when ISI reapplied to get back on the FSS schedule and become a Federal contractor because by then his office had shifted to Department of Homeland Security.

Q. Were you aware of that ?
A. I don't actually remember. I don't know if I heard about that or not,
……..… that in May of 2003 GSA denied ISI the opportunity to get back on the schedule, finding that they did not possess the requisite responsibility and they cited the Federal Acquisition Regulations saying a contractor must have a satisfactory performance record and have a satisfactory record of integrity and business ethics.

83. Mr. Pinnau was not aware of the fact that later in 2003, the Federal Aviation Administration similarly denied ISI the opportunity to obtain a Federal contract because the FAA would not make an affirmative determination of ISI's business ethics to be responsible.

84. FAA Lost Profits

It can be seen that the denial of the FAA contract in the latter part of 2003, specifically because of an alleged lack of responsibility and integrity, referring back to the actions occurring under the GSA contract was a pattern of an ongoing de facto debarment even though IPI has yet to be formally debarred by DOL. This conduct by the GSA Contracting Office in early 2003, by Sheila Brannan and by the FAA, in late 2003 in effect means that the company is de facto debarred and has been since the date of its effective cancellation October 18, 2002, although de facto and not de jure. Cases have recognized therefore that this should count as a mitigating and unusual circumstance precluding the imposition of a now imposed new formal three year period.

85. Exhibit 36 is a letter from the Federal Aviation Administration dated March 21, 2003 to offerors re Solicitation No. DTF A08-03-R-0000 ZOA; Oakland ARTCC; Armed Security Guard Services. Exhibit 37 is the Federal Aviation Administration Solicitation. ISI responded to the Solicitation. Exhibit 38. ISI proposal in response to said Solicitation.

86. Exhibit 39 is the FAA Administration letter to ISI dated September 24, 2003 referencing Solicitation No. DFT A08-03-R-0000; Northern California TRANCON; Armed Security Guard Services; Finding of Non-Responsibility:

> Dear Mr. Pierce:
>
> On September 8, 2003 a letter was sent to you stating that the Federal Aviation Administration (FAA) had received unfavorable information about your performance and legal problems in the State of New York.
>
> Based on my review of ISI's conduct when it engaged in business in New York as IPS, as well as your response, I cannot make an affirmative determination that ISI's business ethics are those that the FAA is entitled to expect from a responsible contractor. Therefore, I am finding ISI to be a non-responsible contractor. If you have any comments or questions please contact me by any of the following methods: phone 310-725-7556, fax 310-725-6842 or james.travers@faa.gov.
>
> Sincerely, James F. Travers, Contracting Officers
> Acquisition Management Branch, AWP-55"

87. Exhibit 40 is the FAA letter, response to solicitation number DTFA08-03-R-0000-NCT:

Dear Mr. Pierce: Thank you for meeting with Ms. B.J. Fisher and myself to discuss the above-referenced solicitation and possible resulting contract. One of the open issues concerns the performance references received from the National Park Services and the General Services Administration. Please respond in writing regarding the alleged investigation(s) of your company by the U.S. Department of Labor and the loss of your New York State license. Please submit your response no later than June 30, 2003.

88. Exhibit 41, is ISI's letter dated June 23, 2003 referencing solicitation number DTFA08-03-R-0000-NCT to Mr. James Travers:

Dear Mr. Travers: This letter follows up your meeting with Mr. Bunce Pierce, our vice president and also is in response to your written inquiry of June 20, 2003. Over the many years that we have had Federal contracts, we have from time to

time had employees who have made allegations of not receiving proper wages and benefits. Rather than bringing these complaints to us for resolution, these employees have gone directly to the U.S. Department of Labor. Naturally, therefore, these complaints have resulted in investigations by the U.S. Department of Labor and we have responded. To date, we can unequivocally state that not one of our employees has ever been short paid or denied any wages or benefits due.

89. Exhibit 46 is a letter submitted by International Protective Services Inc. on September 16, 2003, stating that subsequent to its submission of the offer to the FAA, it received the DOL notice of proposed debarment.

90. Bunce Pierce testified on February 11, 2005 that he was currently employed by International Services and during the time period when ISI had the GSA contract, he was a senior vice president. He remembered that Raymond Postawa was the assistant operations manager in ISI's Albany, New York office, Ralph Purdy was a union official, and Robert Soden was the Contracting Officer's Representative on the Contract. Exhibit 42 Pierce deposition pages 4 and 5.

91. He remembered that Mr. Purdy sent an email to ISI in which Mr. Purdy reported that union officials and employees stated that Mr. Ralph Soden called Ousama Karawia a camel jockey. Pierce testified he advised Mr. Karawia of that action and Karawia stated a formal complaint should be lodged with GSA, which Bunce Pierce did in preparing a letter submitting it to either Bart Knobbs or Roger Pinnau. Pierce deposition page 6.

92. Bunce Pierce remembered that Roger Pinnau, the GSA Contracting Officer, immediately responded and said, Exhibit 4, that it would forward the complaint regarding the camel jockey reference to Mr. Martin McRibbon, a Federal Protective Service Associate, for further action. Mr. Pierce responded further that no one from Federal Protect Service ever responded to ISI's complaint about the camel jockey comment. Pierce deposition page 8. Exhibit 42.

93. Pierce testified on cross that he played a role in ISI in preparing and bidding on contracts and came to ISI after ISI purchased Mr. Pierce's company. Pierce deposition page 10. Exhibit 42.

94. ISI's contract was a follow-on contract although separately and independently bid and competed on by other contractors, which was awarded to ISI on February 28, 2002. Therefore, as of that date, GSA as the Contracting Agency issuing the Contract was satisfied, that as of the date of that award, ISI possessed the full and necessary "responsibility" as that term is used in government contracting and ISI possessed the requisite record of integrity and proper business ethics generally and specifically in connection with the performance of government contracts and its predecessor contracts with GSA.

95. The take over of the contract by Robert Soden GSA FPS COTR who sabotaged and did all he could to have ISI's contract terminated, calling Ousama Karawia a sand nigger and camel jockey, Soden's contractual interference with ISI

management of the Contract, GSA's late payment, compounded by additional direction to withhold freezing the revenue stream of ISI, while DoL demanded concurrent payment of fringes and other payments to employees, and ISI's de facto debarment all establish the "bad faith" and the de facto debarment.

96. The race and ethnicity of Ousama Karawia had a specific impact on GSA's treatment of it under the contract independent of DoL's proceeding to debar and should be taken into consideration.

97. A de facto debarment occurs where a firm is excluded from contracting because a contracting agency makes repeated determinations of non-responsibility, or even a single determination of non-responsibility as part of a long-term disqualification attempt, without following the procedures for suspension or debarment set forth in Federal Acquisition Regulation Subpart 9.4 Standard Tank Cleaning Corp.; B-245364, January 2, 1992, 92-1 CPD P 3 cited in Government Contract Advisory Services, Inc. B-255918, B-255919, 94-1 CPD P181 March 8, 1994. As the facts indicate when GSA denied ISI the opportunity to once again be placed on the FSS schedule and FAA subsequently for the same reasons citing a lack of integrity, the government de facto debarred ISI and its affiliates and principals.

98. The Comptroller General, General Accounting Office now called General Accountability Office in the Matter of: Keeson, Inc.; Ingram Demolition, Inc., B-245625, B-245655 January 24, 1992 sustained a protest where the contractor

said that the Veteran's Administration unduly restricted competition because it automatically excluded any offeror alleged to have violated asbestos regulations without regard to the validity of the allegation comparing this to a de facto debarment. "The effect of these restrictions is analogous to an agency's repeated determinations of non-responsibility or a long term attempt by an agency to preclude a company from competing for government contracts which have been held to constitute de facto debarments citing Old Dominion Dairy Products Inc. v. Secretary of Defense, 631 F.2d 953 (D.C. cir.1980) which found that such actions require a party being debarred procedural due process including notice and an opportunity to be heard on the basis for debarment citing FAR 9.406-3; and other decisions.

99. In Dynamic Aviation v. US, 898 F. Supp. 11 August 28, 1995 the United States District Court for the District of Columbia denied a Government Motion for Dismissal where a contractor alleged a de facto debarment because the Government's actions could meet the requirements of a de facto debarment. The Court rejected the Government's argument and defined a de facto debarment as that which genuinely has been found where the party claiming debarment bid on and was denied more than one contract citing Leslie and Elliott Co. v. Garrett, et al., 732 F. Supp. 191, 197 (DDC 1990). In Leslie and Elliott supra the Court found that there were a number of findings that could support a finding that there was a de facto debarment of the plaintiff. The plaintiff claimed it was a victim of a de facto debarment. The Court held that a statement that an agency will not

award a contract to the disappointed bidder in the future will support a claim of de facto debarment, a court can also find de facto debarment based upon the conduct of the agency. The very reason cited by FAA and GSA attributing the finding of non-responsibility to the ISI's work and history under the instant contract in effect means that they have de facto debarred on ISI.

100. In Art-Metal USA v. GSA, 473 F.Supp.1 (October 6, 1978) the Court rejected the defendant's argument "that there is no such thing as a de facto debarment … These procedures are required regardless of the label placed on the agency action citing Gonzales v. Freeman and Myers and Myers v. US

It did not as other contractors have done folded and left the employees in the lurch.

101. Our case parallels Apex International Management Services., 94-2 BCA 26, 842 Mar. 4, 1995 where the Board laid out a series of events that indicated that the government's conduct was so egregious as to not only convert a termination for default to a termination of convenience, but to categorically set forth as useful information for the parties since there would be a remand to assess quantum, that the governments conduct left it liable for breach type damages i.e. lost profits, not merely typical termination for convenience costs.. Here, appellant alleged a deliberate conspiracy, that the government engaged in improper fraudulent and illegal activities to prevent it from successfully performing its contract work, as a result of which it sustained delays, incurred additional labor

and material costs, was denied payments due under the contract and ultimately forced to file for bankruptcy and to abandon the contract.

The venal conduct condemned therein is quite similar to that herein. In Apex, public officials at Naval Air Station JAX exhibited their hostility and contempt towards the contractor not only by words and gestures but also by their actions breaching the government's contractual obligations. The case lists at least 20 different instances in which the government breached the contract.

AS AND FOR A COURSE OF FIRST COURSE OF ACTION

DEFENDANT IS LIABLE TO PLAINTIFF FOR BREACH OF THE CONTRACT IN THE AMOUNT OF $3,685,097.00.

102. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-101.

AS AND FOR A SECOND CAUSE OF ACTION

DEFENDANT IS LIABLE TO PLAINTIFF FOR FAILING TO COOPERATE IN THE PERFORMANCE OF THE CONTRACT IN THE AMOUNT OF $3,685,097.00.

103. Plaintiff repeats and re-alleges the allegations in Paragraphs 1 - 102.

AS AND FOR A THIRD CAUSE OF ACTION

DEFENDANT IS LIABLE TO PLAINTIFF FOR INTERFERING IN THE PERFORMANCE OF THE CONTRACT IN THE AMOUNT OF $3,685,097.00.

104. Plaintiff repeats and re-alleges the allegations in Paragraphs 1 - 103.

AS AND FOR A FOURTH COUSE OF ACTION

DEFENDANT IN BAD FAITH BREACHED ITS CONTRACT AND IS LIBALE FOR THR SUM OF $3,685,097.00

105. Plaintiff repeats and re-alleges the allegations in Paragraphs 1 - 104.

AS AND FOR A FOURTH COUSE OF ACTION

DEFENDANT IS LIABLE FOR DE-FACTO DEBARMENT OF PLAINTIFF FOR THE SUM OF $3,685,097.00.

106. Plaintiff repeats and re-alleges the allegations in Paragraphs 1-105.

Dated: July 30, 2007

Respectfully submitted,

S/ Sam Z. Gdanski
SAM Z. GDANSKI
3 Rockwood Lane
Suffern, NY 10901
845-362-4800

# CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of July, 2007, a copy of Plaintiff's Amended Complaint with Exhibits was filed electronically with notice to be sent to all parties.

S/ Sam Z. Gdanski

SAM Z. GDANSKI
Attorney for Plaintiff
3 Rockwood Lane
Suffern, NY 10901
Phone: (845) 362-4800
Fax: (845) 362-4700